J-S35016-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.R.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: T.P., MOTHER | : | |
| | : | No. 726 EDA 2020 |

Appeal from the Order Entered February 10, 2020
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000060-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: A.D.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: T.P., MOTHER | : | |
| | : | No. 727 EDA 2020 |

Appeal from the Order Entered February 10, 2020
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0001186-2017

BEFORE: BOWES, J., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.:                    **FILED SEPTEMBER 18, 2020**

T.P. ("Mother") appeals from the decrees entered on February 10, 2020,

in the Court of Common Pleas of Philadelphia County, involuntarily terminating

her parental rights to her daughters, A.D.W., born in June of 2016, and J.R.P.,

---

[*] Retired Senior Judge assigned to the Superior Court.

born in October of 2018 (collectively, Children).[1]   Upon careful review, we affirm.

We summarize the relevant facts and procedural history as follows.  One day after A.D.W.'s birth, the Philadelphia Department of Human Services ("DHS") received a report that Mother was residing in a homeless shelter, which did not permit children to reside therein.  Trial Court Opinion, 4/23/20, at 2.  In addition, the report alleged that Mother suffered from drug abuse and mental illness.[2]  N.T., 2/10/20, at 12.

Upon her discharge from the hospital, the court placed A.D.W. in protective custody.  Trial Court Opinion, 4/23/20, at 2.  On June 15, 2016, the court placed her in shelter care.  *Id.*  The court adjudicated A.D.W. dependent on July 12, 2016.  *Id.*

A.D.W.'s placement goal was reunification.  *See* DHS Exhibit 5.  In furtherance of that goal, the court referred Mother to the Achieving Reunification Center ("ARC") and to the Clinical Evaluation Unit ("CEU") for a drug screen, drug assessment, and drug monitoring.  *Id.*  Mother was required to maintain stable housing and to participate in treatment for drug and alcohol and mental health issues.  N.T., 2/10/20, at 12.  In addition, Mother was

---

[1] By separate decrees entered on February 10, 2020, the trial court involuntarily terminated the parental rights of J.J., the natural father of J.R.P., and B.W., the natural father of A.D.W.  On the same date, the court involuntarily terminated the parental rights of any unknown father of the Children.  Neither J.J., B.W., nor any unknown father filed a notice of appeal.

[2] The record reveals that Mother is diagnosed with bipolar disorder and anxiety.  N.T., 2/10/20, at 16.

required to attend her scheduled visitation with A.D.W., which the court initially granted on a supervised weekly basis. *Id.*

Permanency review hearings occurred at regular intervals. By permanency order dated October 12, 2016, the trial court found Mother in full compliance with her permanency plan. In addition to one supervised weekly visit with A.D.W., the court granted Mother one unsupervised visit every week. *See* DHS Exhibit 5. On April 5, 2017, the court granted Mother two unsupervised visits every week. *Id.* As best we can discern, in all respects except housing, Mother was in compliance with her permanency plan during all of 2017, until May of 2018. *Id.*

By permanency order dated May 1, 2018, the court found that Mother attended ten out of seventeen visits with A.D.W. N.T., 2/10/20, at 42. In addition, on May 1, 2018, the court directed that Mother be referred for a Parenting Capacity Evaluation. *See* DHS Exhibit 5. On October 23, 2018, the court directed, "[Community Umbrella Agency ("CUA")] is to follow up with Parenting Capacity Evaluation Forthwith."[3] *Id.*

Thereafter, in October of 2018, J.R.P. was born at thirty-three weeks gestation, and she weighed three pounds and four ounces. Trial Court Opinion, 4/23/20, at 2-3. Upon her discharge from the hospital, the court

---

[3] The CUA caseworker, Keisha Bell, testified that a parenting capacity evaluation was never performed on Mother. Ms. Bell explained on cross-examination by Mother's counsel, "[I]t was a run around because [the organization that performed parenting capacity evaluations] said that [there] was only one doctor over there at that time, so, it kept getting pushed back and pushed back, and it never happened. . . ." N.T., 2/10/20, at 39.

placed J.R.P. in protective custody. The court placed J.R.P. in shelter care on October 31, 2018, and adjudicated her dependent on November 9, 2018. *See* DHS Exhibit 6.

J.R.P.'s placement goal was also reunification. Mother was granted unsupervised visits with J.R.P. to occur separately from her visits with A.D.W. *See* DHS Exhibit 6.

By permanency order dated October 21, 2019,[4] the court found that Mother was attending outpatient mental health therapy through John F. Kennedy Behavioral Health ("JFK"), and that she was engaged in a recovery management program. *See* DHS Exhibits 5 & 6. During the relevant review period, Mother had not been consistent in visiting the Children. N.T., 2/10/20, at 17-19. Nevertheless, the court maintained Mother's unsupervised visits with the Children. In addition, the court directed CUA to supervise two visits per month between Mother and the Children. *Id.*

On January 24, 2020, DHS filed petitions for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). A hearing occurred on February 10, 2020,[5] during which DHS

---

[4] The October 21, 2019 permanency review order is the final such order on the trial court dockets, which are included in the certified records as DHS Exhibits 5 & 6.

[5] During the hearing, an attorney-guardian *ad litem* ("GAL") represented the best interests of three-year-old A.D.W. and one-year-old J.R.P. A separate Child Advocate represented the legal interests of A.D.W. As such, the trial court complied with *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017),

presented the testimony of Keisha Bell, the CUA caseworker; N.M., the foster Mother of A.D.W.; and D.B., the foster Mother of J.R.P. Mother testified on her own behalf.

By decrees dated and entered on February 10, 2020, the trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The trial court filed its Rule 1925(a) opinion on April 23, 2020.

On appeal, Mother presents the following issues for our review:

A. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act[,] 23 Pa.C.S. § 2511(a)(1), (a)(2), (a)(5), and (a)(8)?

B. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental[,] physical[,] and emotional needs of the child as required by the Adoption Act[,] 23 Pa.C.S. § 2511(b)?

---

which held that 23 Pa.C.S. § 2313(a) requires a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, which the Court defined as a child's preferred outcome. *Id.* at 180. In addition, the trial court complied with *In re T.S.*, 192 A.3d 1080 (Pa. 2018), which held that, in cases where there is no conflict between a child's legal and best interests, a GAL "representing the child's best interests can also represent the child's legal interests. . . ." *Id.* at 1092. Further, the *T.S.* Court held that there can be no conflict between the child's legal and best interests if the child is very young and preverbal, and the child's preferred outcome is incapable of ascertainment as a result. *Id.*

Mother's brief 3-4.

We review Mother's issues for an abuse of discretion, as follows.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, we conclude that the certified record supports the orders pursuant to Section 2511(a)(2) and (b), which provide as follows.

- 6 -

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b); **see also In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).[6]

This Court has explained that the moving party must produce clear and convincing evidence with respect to the following elements to terminate

_____

[6] Based on this disposition, we need not consider Section 2511(a)(1), (5), and (8).

parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* Further, the grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

With respect to Section 2511(b), we have explained, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the

effect on the child of permanently severing that bond." ***Id.*** (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

On appeal, Mother asserts that DHS did not satisfy its burden of proof with respect to the third element of Section 2511(a)(2), that her parental incapacity, neglect, or refusal cannot or will not be remedied. We disagree.

Keisha Bell, the current CUA caseworker for this family, testified that Mother is in minimal compliance with her permanency plan objectives. N.T., 2/10/20, at 20. Specifically, she testified that Mother is currently residing in an apartment, which she secured through a housing program. ***Id.*** at 15-16. Ms. Bell testified that the housing program requires that the tenants pay rent, but Mother is behind in rental payments. ***Id.*** Further, in the past six months, Ms. Bell attempted to see Mother's apartment, but Mother did not cooperate in scheduling a time for her visit. ***Id.*** at 13-15. Ms. Bell testified that she visited Mother's apartment without an appointment "at least four or five times," but Mother was not home. ***Id.*** at 13. Therefore, Ms. Bell has not been able to assess Mother's home. ***Id.*** at 37.

With respect to visitation, Ms. Bell testified that, since the last permanency hearing in October of 2019, Mother made no attempt to visit with

the Children. *Id.* at 17-19. She testified that Mother stated that she does not have transportation to visit with the Children. *Id.* at 19-20. However, Ms. Bell testified that Mother's apartment is "[a] couple blocks or so" from the CUA office. *Id.* at 20. Therefore, Mother could walk to the CUA office. *Id.*

N.M., the foster mother of A.D.W. since the time of her placement, testified that she arranged visitation between Mother and A.D.W. in the past. *Id.* at 45. N.M. testified that Mother has only visited A.D.W. on four occasions since August of 2019, and that she has not visited the child at all since the last court date in October of 2019. *Id.* at 44-45.

D.B., the foster mother of J.R.P. since the time of her placement, testified that Mother has not visited J.R.P. since June of 2019. *Id.* at 52-53. In addition, N.M. and D.B. testified that, despite Mother having their telephone numbers, she has not placed a telephone call to their homes regarding the Children. *Id.* at 45-46, 53.

Mother testified on direct examination that she has not visited the Children since August of 2019. *Id.* at 64, 66. Mother testified:

Q. Can you tell [the judge] why you have not visited [the Children] since August?

A. Besides carfare, I've made numerous attempts, Your Honor, to reach out to Keisha Bell. I called, I've called her in front of my therapist, I called her [from] the group room. And I made like at least five or six attempts to go down to [the CUA office] myself, I get a Transpass, so there's no excuse why I can't -- why I didn't go down there, Your Honor, I have went down there.

Q. And so is it your testimony you needed transportation to see [the Children]?

- 10 -

A.  At first, yes, until I got the Transpass.

Q.  So when you got the Transpass, did you make attempts to see [the Children]?

A.  Yes, I have.

. . .

Q. What happened with those attempts?

A.  I haven't been able to contact [Ms. Bell,] get in contact with her on the phone.

Q. What about contact with the foster parents. . .?

A.  I was told to contact her, not the foster parents.

*Id.* at 64-65.  Nevertheless, Mother testified on cross-examination by the Child Advocate that, prior to August of 2019, she made arrangements directly with the foster parents to visit A.D.W.  *Id.* at 72-73.  On cross-examination by the GAL, Mother testified:

Q. When did you get your Transpass . . .?

A.  I believe back in November.

Q. Of '19?

A.  Yes.

Q. So [do you] make it to all your programs?

A.  Yes, I do.

. . .

*Id.* at 71-72.

Based on the foregoing, we discern no abuse of discretion by the trial court in concluding that Mother's conduct warrants termination under Section 2511(a)(2). The competent record evidence demonstrates that Mother's repeated and continued incapacity, neglect, or refusal has caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being.

With respect to the third element of Section 2511(a)(2), the causes of the incapacity, neglect, or refusal cannot or will not be remedied, A.D.W. was three years old, and J.R.P. was one year old at the time of the termination hearing. The Children had been in separate foster homes their entire lives. Although Mother was compliant with the mental health and drug and alcohol requirements under the permanency plan, she never cooperated with CUA to assess her apartment for a determination on whether it is appropriate for the Children, and she was behind in rent payments. Further, during the October of 2019 permanency hearing review period, Mother became inconsistent with visitation. Mother made no attempt from August of 2019, through the time of the subject proceeding, to visit with the Children, even though she lived in walking distance to CUA's office, and she received a Transpass for transportation, which would enable her to participate in unsupervised visits in the community. Therefore, we discern no abuse of discretion by the court in concluding that Mother's incapacity, neglect, or refusal, cannot or will not be remedied. Mother's first issue fails.

With respect to Section 2511(b), Mother asserts that DHS failed to present any evidence with respect to the bond, if any, between Mother and the Children. In addition, Mother asserts that DHS failed to request a bonding evaluation between Mother and the Children. Therefore, Mother argues that DHS failed to satisfy its burden of proof. We disagree.

This Court has explained:

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010).

Our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, there is no evidence that Mother and the Children share a parent-child bond. As such, it was reasonable for the trial court to infer that

- 13 -

none exists.  ***See In re K.Z.S.***, 946 A.2d at 762-763.  Further, this Court has long held that a trial court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert.  ***In re K.K.R.-S***., 958 A.2d 529, 533 (Pa. Super. 2008).

> Ms. Bell testified:
>
> Q. [D]o you believe there [would be] irreparable harm to either child if the bond between [M]other and the [C]hildren were [terminated]?
>
> A.  I don't think so.  Their bond with their foster parent[s] seems to be exceptional.

***Id.*** at 22.  In addition, on cross-examination by the Child Advocate, Ms. Bell testified:

> Q. [A.D.W.] refers to her foster parents as mother and father, correct?
>
> A.  Correct.

***Id.*** at 33.  Ms. Bell also testified that the Children are thriving and getting the care they need in their foster placements.  ***Id.*** at 23.

Based on the foregoing, we discern no abuse of discretion by the trial court pursuant to Section 2511(b).  Clear and convincing evidence demonstrates that the Children's developmental, physical, and emotional needs and welfare are served by involuntarily terminating Mother's parental rights.  Mother's second issue fails.  Accordingly, we affirm the decrees.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>9/18/20</u>